IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEATHER ECHOLS,

                Plaintiff,                  CV-06-293-ST

     v.                              OPINION

LOKAN & ASSOCIATES, INC., an Alaska
corporation, dba OPTI STAFFING GROUP,

                Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Heather Echols ("Echols"), filed this action on March 2, 2006, alleging the

following claims against her former employer, Lokan & Associates, Inc., dba Opti Staffing

Group ("Opti"): (1) pregnancy discrimination under Title VII of the Civil Rights Act of 1964,

42 USC § 2000e *et seq* ("First Claim"); pregnancy discrimination under ORS chapter 659A

("Second Claim"); (3) perceived disability discrimination under ORS chapter 659A ("Third

Claim"); and (4) discrimination in violation of the Employee Retirement Income Security Act ("ERISA"), 29 USC § 1140, *et seq* ("Fourth Claim").

This court has original jurisdiction over the federal statutory claims under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367(a).

Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with FRCP 73 and 28 USC § 636(c).

Opti has now filed a motion for summary judgment (docket #17), contending that Echols cannot establish a *prima facie* case of discrimination under Title VII and ORS 659A.030, and has not offered sufficient evidence to create a genuine issue of material fact as to whether Opti fired her because it perceived her as disabled or to prevent her from enrolling in its group plan. This court previously issued an Order granting summary judgment against Claim Three alleging Perceived Disability Discrimination and Claim Four alleging ERISA discrimination and otherwise denying summary judgment (docket #55). This Opinion explains the reasons for that decision.

## **UNDISPUTED FACTS**

A review of the materials submitted by the parties, including affidavits, declarations, and deposition excerpts, reveals the following facts viewed in the light most favorable to Echols:

Opti is in the business of meeting the staffing needs of businesses in Washington, Oregon, and Alaska. It employs sales staff ("direct hire consultants") to market its services to companies seeking assistance in filling permanent job positions for a one-time fee.

Echols began working for Opti on September 6, 2005, as a direct hire consultant at its office in Lake Oswego, Oregon. A direct hire consultant is an at-will employee. Mike Houston

("Houston") managed Opti's Lake Oswego office, was Echols' direct supervisor, and both hired and fired her.

The only other direct hire consultant working at Opti's Lake Oswego office during Echols' employment was Debra "Debbie" Strong ("Strong"). Strong was Houston's fiancé at that time and later became his wife.

Soon after beginning work, Echols informed Houston that she was pregnant. Echols was initially given documents explaining the duties and job expectations of a direct hire sales consultant. Among the general duties listed were "mak[ing] 25 action calls (contacts with a hiring authority) each and every day" and "meet[ing] minimum monthly sales goals set by [the] Supervisor/Branch Manager." Dolan Decl., Exhibit 4.[1] She was told that she would be eligible for commissions six months after her start date. According to Houston, at the end of the first 90 days, employees can start earning commissions and any deficit incurred in the first 90 days is erased.

Echols received formal computer training from Houston for two days, a few hours each day, as well as on-the-job training from Strong. She felt adequately trained to do her job and did not wish that Houston had provided more training.

On or around October 14, 2005, Echols made her one and only sale in the amount of $3,552.00.

Direct hire consultants can enroll in Opti's group health plan after 90 days of employment and must pay a portion of the premiums. Houston had informed Echols during her interview that she would be entitled for enrollment in the health plan after her 90th day. On

---

[1] Whether Houston set any sales goals is disputed. Opti claims that it set a $10,000 monthly sales goal for its direct hire consultants.

December 8, 2005, Echols asked Melinda Buxton ("Buxton"), a receptionist, about whom to contact to enroll in Opti's group health plan.  Buxton told her to ask Houston.  The next day Echols talked to Houston about enrolling in the medical benefits plan.[2]  He told her that he would get the relevant contact information and provide it to her the following day.

On December 9, 2005, Houston terminated Echols' employment.

## DISCUSSION

I.    **Pregnancy Discrimination Under Title VII (First Claim)**

A.    **Legal Standard**

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex." 42 USC § 2000e-2(a)(1).  "[F]or all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."  *Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 US 669, 684 (1983).

Under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973).  *McGinest v. GTE Serv. Corp.*, 360 F3d 1103, 1122 (9th Cir 2004), the plaintiff must establish a *prima facie* case of unlawful discrimination by showing that "(1) [s]he belongs to a protected class; (2) [s]he was performing her position in a satisfactory manner; (3) [s]he was subjected to an adverse employment action; and (4) similarly situated [persons outside her protected class] were treated more favorably."  *Aragon v. Republic Silver State Disposal, Inc.*, 292 F3d 654, 658 (9th Cir 2002) (citation omitted).  "The requisite degree of proof

---

[2] Echols is likely confused about her dates, since the "next day" would be December 9, 2005, the same date that she was terminated.

necessary to establish a *prima facie* case for Title VII . . . on summary judgment is *minimal* and does not even need to rise to the level of a preponderance of the evidence." *Id* at 659 (citation omitted, emphasis in the original).

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994) (citation omitted). This is only a burden of production and involves no credibility assessment. *Lindsey v. SLT Los Angeles, LLC*, 447 F3d 1138, 1147-48 (9th Cir 2006), citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 US 133, 142 (2000).

If the employer produces sufficient evidence to support a non-discriminatory explanation for its decision, the burden-shifting framework disappears, and the plaintiff must raise a genuine factual question whether, viewing the evidence in the light most favorable to her, the employer's reasons are pretextual, *i.e.* "unworthy of credence." *Reeves*, 530 US at 143 (citations omitted). Although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, "the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom'" on whether the defendant's explanation is pretextual. *Id* (citation omitted).

Pretext can be established in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Ca. Davis, Bd. of Trustees*, 225 F3d 1124, 1127 (9th Cir 2000), citing *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1220-22 (9th Cir 1998). To survive

summary judgment, "[plaintiff] is not required to provide direct evidence of discriminatory intent as long as a reasonable factfinder could conclude - based on [plaintiff's] *prima facie* case and the factfinder's disbelief of [defendant's] reasons for discharge, that discrimination was the real reason for [plaintiff's] discharge."  *Nidds v. Schindler Elevator Corp.*, 113 F3d 912, 918 n 2 (9th Cir 1996), *cert denied*, 522 US 950 (1997).  Direct evidence of discrimination is "evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F3d at 1221 (citation omitted).[3]  Although the plaintiff may come forward with circumstantial evidence that the employer's proffered reasons were pretextual, such circumstantial evidence must be "specific" and "substantial" to create a triable issue of fact as to whether the employer intended to discriminate.  *Id* at 1222.[4]

**B.    Analysis**

**1.    *Prima Facie* Case**

For purposes of this motion, Opti concedes that Echols belongs to a protected class (pregnant women) and was subject to an adverse employment action (termination).  However, Opti seeks summary judgment because Echols has failed to establish a *prima facie* case that she was performing her position in a satisfactory manner and that she was treated differently than similarly situated persons outside her protected class.

**a.    Job Performance**

---

[3]  In *Stegall v. Citadel Broadcasting Co.*, 350 F3d 1061, 1066 (9th Cir 2003), the Ninth Circuit noted that *Desert Palace, Inc. v. Costa*, 539 US 90 (2003), may undermine *Godwin* to the extent that it implies that direct evidence is more probative than circumstantial evidence.

[4]  *But see Cornwell v. Electra Cent. Credit Union*, 439 F3d 1018, 1030-31 (9th Cir 2006) (discussing, without deciding, whether post-*Godwin* cases may have overturned the "specific" and "substantial" requirement in *Godwin*).

Echols has presented sufficient evidence to satisfy her minimal *prima facie* burden that her job performance was satisfactory. That evidence consists, in part, of compliments on her performance from both Houston and Strong. Houston does not deny that on several occasions he told Echols that she was doing a great job contacting people, that she was "doing fine," and encouraged her to "[g]ive it time" because "it takes time to make the sales. It takes a year to even build up all your contacts and prospects for things to start panning out." Houston Depo., p. 51.[5] Strong also told Echols that she was "on the right road." Echols Depo., pp. 50-51, 11, 122. In addition, Echols states that she received no warning from Houston that her performance was sub-par, had no knowledge that she was required to meet a $10,000 monthly sales requirement, and that she made the required 25 action calls per day.

b.    **Differential Treatment**

Echols contends that under *Kortan v. California Youth Authority*, 217 F3d 1104, 1113 (9th Cir 2000), she must prove either that she suffered "an adverse employment action" *or* "was treated differently from others similarly situated," but not both. Because Opti has already admitted that Echols suffered an adverse employment action, Echols believes she does not have to offer any evidence that she was treated differently than similarly situated employees. This court disagrees.

*Kortan* indeed states that "[i]n order to establish a prima facie case of employment discrimination, [plaintiff] must show that she was a member of a protected group . . . that she was adequately performing her job . . . and that she suffered an adverse employment action, *or* was treated differently from others similarly situated." *Id* at 1113, citing *McDonnell-Douglas*,

---

[5] Houston also testified that he does not believe he ever told Echols she was doing a great job.

411 US at 802 (emphasis added). However, *McDonnell-Douglas* describes these as distinct elements, both of which are necessary to make a *prima facie* case of discrimination under Title VII. In the context of a discriminatory failure to hire based on race, *McDonnell-Douglas* held that a *prima facie* case requires the plaintiff to show: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; *and* (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id* at 802 (emphasis added). In the context of a discriminatory termination, the Ninth Circuit also requires two distinct elements to prove a *prima facie* discrimination claim. *See Aragon*, 292 F3d at 658; *Chuang*, 225 F3d at 1123. Therefore, in order to meet her *prima facie* burden of proof, Echols must prove both that she has suffered an adverse employment action and that she was treated differently than similarly situated non-pregnant employees.

Echols contends she was treated differently than two non-pregnant employees, Patty Gilbert ("Gilbert") and Sandra Springer ("Springer"). Gilbert worked as a direct hire consultant at Opti's Lake Oswego office from January 2004 through April 2005 before Echols was hired. Although she often failed to meet sales expectations, Houston eventually moved her to a temp-to-hire sales position rather than terminating her. After Echols was terminated, Houston hired Springer as a direct hire consultant in the Lake Oswego office on February 15, 2006, and supervised her for the first 45 days. On April 1, 2006, Houston stepped down and Laurie Weyhrauch ("Weyhrauch") became the new branch manager. Although Springer was terminated for not meeting performance expectations, she remained employed until September 7, 2006, and was terminated by Weyhrauch rather than by Houston.

8 - OPINION

Although Gilbert did not meet the goal of $10,000 sales per month, Opti claims that she is not a valid comparator because she met performance expectations by making 25 action calls per day and added value to the company by referring numerous sales to the temp-to-hire side of Opti's business.  Opti also claims that Springer is not a valid comparator because she was only supervised by Houston for 45 days and had a different supervisor for the rest of her employment.

Despite these differences, both Gilbert and Springer are similarly situated employees to Echols.  "Similarly situated" means "in all material respects."  *Moran v. Selig*, 447 F3d 748, 755 (9th Cir 2006), citing *Aragon*, 292 F3d at 660, citing *McGuinness v. Lincoln Hall*, 263 F3d 49, 53-54 (2nd Cir 2001) (citation omitted).  In *McGuinness*, the Second Circuit rejected the interpretation that "another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct."  263 F3d at 53.  Instead, the comparator must be "similarly situated in all *material* respects - not in *all* respects."  *Id* (citation omitted, emphasis in original).  The court went on to say that "where a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *Id* at 54.

Opti maintained statistical evidence of monthly sales by both Gilbert and Springer in the same format as some of the statistical evidence of Echols' performance.  Both were supervised by Houston at least part of the time, were presumably trained by Houston, and worked alongside Strong.  Even if Opti expected its direct hire consultants at the Lake Oswego office to sell

$10,000 per month by the third month, which is disputed, neither Gilbert nor Springer reached

that goal, except for Springer in her second month.  Therefore, they may be deemed as similarly

situated to Echols.

Even if Gilbert and Springer are similarly situated employees, Opti points out that both

had considerably better sales in their first three months than Echols.  Gilbert made $7,000 in

sales in both January and February 2004 and $4,750 in March 2004.  While Opti has submitted

no statistics for the first two weeks of her employment, Springer made $2,325 in sales in March

2006 and $10,457.25 in April 2006.  Nevertheless, both struggled to meet the alleged

requirement after the initial three-month period.  Gilbert continued to have sub-par sales

numbers, including $1,500 in April 2004, $2,400 in May 2004 and nothing in June and July

2004, but was not terminated.  Instead, she was allowed to stay in the position for 15 months and

then was transferred to another Opti position.  In that regard, she was treated differently from

Echols for a comparable sales performance during the span of three to four months.  In contrast,

it is somewhat difficult to evaluate Springer's performance after her initial three-month period.

The record does not reveal her sales for May 2006, but she made $4,056 in sales in June 2006,

$3,161.60 in July 2006, and nothing in August.  Springer was terminated due to her performance,

but almost seven months after her start date, rather than after three months as Echols.  Her better

overall numbers, as well as one stellar performance in her third month, may have reasonably

delayed the decision to terminate her.  However, that is a fact issue.

Regardless of their below-expectations *sales performance*, Opti contends that Springer

and Gilbert had better *sales activities* than Echols based on two sets of statistics.  One set

tabulates the daily user statistics for the Lake Oswego office employees during the time Echols

worked there, classified by the number of phone calls, letters, emails and meetings.  Dolan Decl.,

Exhibit 8.  Opti has offered no evidence of the daily user statistics for Gilbert and Springer, nor

any explanation for why such information is missing.  The other set tabulates the weekly action

calls (organized by day) of direct hire consultants, including Echols, Strong (not a comparator)

and Springer.  *Id*, Exhibit 6.  Although Echols' number of daily phone calls appearing in the

daily user statistics report contradicts Echols' testimony, it often does not correspond to the

number of phone calls in the action calls report.  The record contains no explanation for the

discrepancy.

There is no statistical evidence of the action calls Gilbert made as a direct hire consultant.

Instead, Opti submits only Houston's testimony that Gilbert's activity level was "extremely high

and she referred quite a bit of business to [Opti's] temp side."  Houston Depo., p. 44.  Absent the

supporting statistical evidence, the court is left without an objective basis for comparison.

The statistical evidence for Springer's action calls during her first three months is

incomplete, missing the first three weeks of her employment, while the evidence for Echols is

missing the first two weeks in September and two weeks in October.  Comparing the available

information for Springer and Echols, Springer had higher average action calls per day than

Echols during the first three months, but also failed to average  25 action calls per day.

Opti urges that a more appropriate comparator is Tiana Julian ("Julian"), who worked as

a direct hire consultant at the Lake Oswego office between December 8, 2004, and March 31,

2005, for a total of three months and 24 days.  Julian "more often than not" failed to make 25

action calls per day and only made one placement resulting in a sale of $2,418.  Houston Decl.,

¶ 3; Dolan Suppl. Decl., Exhibit 23.  Opti has submitted no statistics of her sales level or nor

"user statistics" for the time she was at the Lake Oswego office.  But even if Julian was treated similarly to Echols, Echols has submitted evidence that other valid comparators (Gilbert and Springer) were treated differently.

Thus, Echols has met her *prima facie* burden by presenting sufficient evidence that she: (1) belongs to a protected class (pregnant women); (2) was performing her position in a satisfactory manner; (3) was subjected to an adverse employment action (termination); and (4) was treated differently than a similarly situated non-pregnant employee (Gilbert and possibly Springer).

### 2.    Legitimate Nondiscriminatory Reason

Because Echols has met her *prima facie* burden, Opti is required to articulate a legitimate, non-discriminatory reason for its adverse employment action.  Opti has submitted records of work performance, notes from meetings between Houston and Echols, and deposition testimony to prove that Echols was terminated for poor work performance, specifically the inability to meet performance expectations of $10,000 in sales per month or to generate enough sales activity by making 25 activity calls per day.

Among other evidence, Houston's handwritten notes allegedly summarize his conversations with Echols about her job performance.  According to the first note dated on October 12, 2005, Houston talked to Echols about her "activity level [being] much to [*sic*] low" and her attendance "affecting" and "hindering her performance."  Dolan Decl., Exhibit 9.  The second note reflects that on November 3, 2005, he again talked to Echols about attendance and its impact, and gave her a list of people he wanted her to contact.  According to the note dated November 14, 2005, Houston told Echols that "the calls in particular are way off the mark" and

that "her activities as a whole are not sufficient to generate her success unless she really pushes the numbers up."  *Id* at Exhibit 11.  When asked about the list of leads Houston had provided her with at their previous meeting, Echols responded that "she was trying to get to it."  *Id*.  Houston allegedly told Echols that she was not "generating enough.  the lack of calls and PR's, activities as a whole, is going to have a negative impact and combined w/ the time she has missed it will be tough to achieve the sales numbers to cover draw and minimum expectations."  *Id*.

This evidence is sufficient to overcome the presumption of discrimination established by Echols' *prima facie* case.

### 3.    Pretext

Echols contends that Opti's articulated reason for terminating her is pretextual because it is internally inconsistent with its actions towards her and others.

First, Echols denies ever being given a sales goal of $10,000 per month.  When asked what sales quota Echols was given, Houston testified that: "In order to cover your draw, you have to produce at least $8,700 per month" beginning "*after* the 90th day," *i.e.* "[s]tarting for the month following her 90th day."  Houston Depo., pp. 37-38 (emphasis added).  In fact, according to Houston, after the first 90 days of employment, employees with a sales deficit do not have to make up that deficit.  Houston is also unaware of any document that created such a goal for any other direct hire consultant.  He admits that he gave Echols no production goal for October and cannot recall if he gave her one for September.  He told Echols that he believed "by the time somebody got into their third month they ought to be able to do $10,000 a month in business," and gave her that goal for November (*id* at 75), which she denies.  In contrast, Strong stated that the $10,000 goal starts *after* three months, although she never saw a writing to that effect.

Lastly, as discussed above, Gilbert, and to a certain extent Springer, did not meet the alleged $10,000 monthly sales goals during their first three months either, although Gilbert had slightly higher sales during those months and Springer met the goal in only one month.

Opti responds by claiming that a direct hire consultant can meet performance expectations *either* by having $10,000 sales per month *or* by having high sales activities, *i.e.* 25 action calls per day. Regardless of whether she was required to make $10,000 per month in sales, Echols had to make 25 action calls per day as part of her basic job duties, which she admits.

Opti has submitted statistical evidence indicating that Echols never came close to meeting those expectations. However, as already noted, the statistical evidence regarding Echols is incomplete, with two weeks missing in September and two in October. Opti has offered no explanation for those gaps and also has failed to explain the inconsistency between the number of Echols' phone calls as appearing in the daily user statistics report and the number of action calls she made according to her activity calls report. There may well be a legitimate explanation, but it is not in the record.

Echols counters Opti's statistical evidence with her testimony that she made the requisite number of calls per day and that every time she made an action call, she made a note in the respective computer file. She neither recorded the number of action calls nor received tabulations of her action calls from Houston.

When the employer's proffered reason is poor work performance, the employee's own statement that she was performing at a level equal to other employees is not enough to raise a genuine issue of material fact that the employer's reason is pretextual. *Aragon*, 292 F3d at 660

(citation omitted).  However, Echols' testimony is just as reliable as Opti's evidence with respect to Gilbert's level of activity calls, which is based solely on Houston's testimony without corroborating statistical evidence.  Furthermore, the record reveals that while Springer had a higher level of activity calls than Echols, she also failed to meet the required 25 daily activity calls during her first three months, and the first two weeks of her activity statistics are missing.  Yet she was not terminated for seven months.  In conclusion, to the extent that Opti required employees to make $10,000 a month for three months *or* 25 activity calls per day in order to keep their jobs, no statistical evidence supports the conclusion that Echols, Gilbert or Springer met that requirement.  Yet only Echols was terminated after 90 days.

Opti also submits Houston's testimony that he discussed Echols' poor performance with her on three separate occasions.  However, Echols denies having *any* conversations with Houston where she was warned about not performing satisfactorily before the day of her termination and maintains that she was never shown any records indicating that she was underperforming.  In fact, she points out that Houston made an unsolicited offer to write a letter of recommendation and be a reference for her to future employers.

Second, Echols testifies that she was treated differently after she informed Houston of her pregnancy.  Before that time, she was treated well, "she and Strong liked each other," and Houston trained her on the computer and gave her helpful tips.  Echols Depo, pp. 24, 27-28, 52, 118-19; Strong Depo, pp. 6-7.  Once Echols notified Houston of her pregnancy, she contends that everything began to change.  Houston shared the news of the pregnancy with Strong who asked Echols whether she planned on coming back to work after the baby because there was a lot of training involved and neither she nor Houston wanted to spend time training her if she was not coming back.  Her on-the-job training came to an abrupt end.  She no longer received "helpful

15 - OPINION

hints" from Houston and experienced a "cold shoulder" from both Houston and Strong.  Echols

Depo., pp. 118-19, 128-29; Busse Decl., Exhibit 13.  Echols mentioned this change in attitude

towards her to another employee.

In addition, Echols claims that once she began having regular doctor's appointments

related to her pregnancy, her sales opportunities were sabotaged.  She was no longer transferred

her fair share of candidate resumes and sales calls, with Strong receiving the lion's share of both,

despite the official practice of rotating incoming calls.  Buxton and Houston testified that

exceptions to the rotation system were made for situations where one direct hire consultant was

absent (the calls would be transferred to the other) and for responses to a direct hire consultant's

individual ads, which would be sent to that person.  But Echols testified that she knew the

resumes were in response to Opti's ads, rather than to Strong's ads.  Echols also maintains that

she was socially marginalized in the workplace.

Echols attributes the reason for the changed attitude, lack of further training, sabotage of

her performance and marginalization to her pregnancy.  She submits evidence that during her

maternity leave, Houston and his fiancé would have had to cover her shift.  *See* Houston Depo.,

p. 79 (when an employee goes on maternity leave, it is the duty of the branch manager and other

direct hire consultant to "pick up the slack").

Third, Echols contends that Opti's current proffered reason for her termination (poor

performance) is inconsistent with the reason Houston gave her on the day she was terminated,

namely absenteeism.  Without referencing poor performance, Houston told her she was being

fired because she had to take too much time off work for doctor's appointments and recovery

from her car accident.[6]  Echols Decl., ¶ 2 ("[e]ach time you take off and come back, you are further and further behind and soon you will be having your child and need even more time off. I think keeping you here would be setting you up for failure").  She has submitted evidence that all her absences were excused (including a one-week vacation, which had been arranged before she took the job and was approved by Houston, as well as bed rest ordered by her doctor after a car accident), and that most of her absences were related to her pregnancy.  However, in her deposition Echols admitted that on the day she was terminated, Houston told her she was not meeting the performance standards:

> Q.  Did [Houston] ever meet with you and just, Gee, you're just kind of not cutting it?
> A.  Other than the day I was terminated, no.
> Q.  Other than the day you were terminated did you ever have any meeting where he sat down with you and said, Gee, Ms. Echols, you're not really meeting the performance standards that you need to be meeting?
> A.  No.

Echols Depo., pp. 51-52.

Because that conversation happened on the date of Echols' termination, it raises an inference that she was terminated at least in part for this reason.

In sum, Echols has submitted sufficient evidence to raise a genuine issue of material fact as to whether Opti's proffered reason for terminating her is pretextual.  She was not given any sales goals for the first 90 days; employees who kept their jobs past the alleged probationary period (Springer and especially Gilbert) also underperformed during their first 90 days as neither met the alleged sales quota; Springer did not make her 25 calls per day, and there is a question of fact as to whether Gilbert did; the statistical evidence provided is incomplete and full of

---

[6]  Houston denies telling Echols that she took too much time off for doctors' appointments.

unexplained discrepancies; Echols was told that she was doing a good job and was not warned about her performance until the date of her termination; her absences were excused; Houston shared with Strong the news of Echols' pregnancy; Strong then asked about Echols' plans after maternity leave; Houston admitted that had Echols not been terminated, he and Strong (his fiancé) would have had to cover her work load while she was out on maternity leave; and their changed attitude against her interfered with her training and opportunity to perform.

Because of disputed facts premised in large part on the witnesses' credibility, Opti's motion for summary judgment on this claim is denied.

## II.     Pregnancy Discrimination Based on ORS 659A.030 (Second Claim)

Establishing a *prima facie* case of discrimination under ORS 659A.030 requires the plaintiff to meet the same elements as a *prima facie* case under Title VII. *Pascoe v. Mentor Graphics Corp.*, 199 F Supp 2d 1034, 1052 (D Or 2001), citing *Henderson v. Jantzen, Inc.*, 79 Or App 654, 657, 719 P2d 1322, 1324, *rev denied*, 302 Or 35, 726 P2d 934 (1986).

Because Echols has established a genuine issue of material fact under Title VII, Opti's motion for summary judgment on the state claim under ORS 659A.030 also is denied.

## III.    Perceived Disability Discrimination Based on ORS 659A.112(1) (Third Claim)

### A.     Legal Standard

ORS 659A.112(1) prohibits an employer from discriminating "in terms, conditions, or privileges of employment because an otherwise qualified person is a disabled person." ORS 659A.100 defines a "disabled person," in part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities, . . . or is regarded as having such an impairment." A person is "regarded as having such an impairment" if he or she:

(A) Has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer or supervisor as having such a limitation;

(B) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or

(C) Has none of the impairments described in subparagraph (A) or (B) of this paragraph, but is treated by an employer or supervisor as having a mental or physical impairment that substantially limits one or more major life activities.

ORS 659A.100(2)(c).

The Oregon legislature intended for courts to construe ORS 659A.112 to 659A.139 "to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act ["ADA]." ORS 659.139. Therefore, claims under Oregon's statute are subject to the same analysis as used for ADA claims. *Alexander v. Eye Health Northwest, P.C.,* 2006 WL 2850469 * 2 (D Or Oct 3, 2006) (citations omitted).

To prevail on a claim of perceived disability discrimination, the plaintiff must present evidence that the defendant regarded her as having a physical or mental impairment that substantially limits a major life activity. *Id* at * 3. "Substantially limits" means:

(A) The impairment renders the individual unable to perform a major life activity that the average person in the general population can perform; or

(B) The impairment significantly restricts the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity.

ORS 659A.100(2)(d).

In Oregon, where a plaintiff alleges that her pregnancy did not impair her ability to do her job, but the employer regarded it as an impairment, plaintiff has stated a sufficient claim for perceived disability discrimination to survive a motion to dismiss. *Melvin v. Kim's Restaurant,*

308 Or 177, 180-82, 776 P2d 1286, 1287-88 (1989) (*en banc*) (denying employer's motion to dismiss).  "Conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination."  *Humphrey v. Mem. Hosp. Ass'n*, 239 F3d 1128, 1139 (9th Cir 2001).

Absent direct evidence of discrimination, federal courts with diversity jurisdiction apply the *McDonnell Douglas* burden-shifting analysis to claims of disability discrimination brought under ORS 659A.112 to ORS 659A.139.  *Snead v. Metro. Prop. & Casualty Ins. Co.*, 237 F3d 1080, 1090-94 (9th Cir 2001).  Although this court is court exercising federal question jurisdiction with supplemental jurisdiction over state law claims, it is appropriate to apply federal procedural law.

**B.    Analysis**

Although not expressly presented as such, this court understands Echols to claim that Opti regarded her as substantially limited in the major life activity of working due to absenteeism attributed to a perceived disability (pregnancy).

Echols has submitted evidence that she had four OB/GYN appointments during her 90 days at Opti: two ultrasounds on September 19 and October 27, 2005, and two doctors' appointments on October 13 and November 9, 2005.  The record does not reflect whether she missed full days for these appointments.  She also missed three days of work due to a car accident, hospitalization, and subsequent bed rest ordered by her doctor to protect her fetus.  She missed one week of work due to a pre-arranged vacation.  She missed another day to stay home with a sick child and possibly part of a day for a dentist appointment.  Based on this record, at least half of Echols' absences are unrelated to her pregnancy.  This raises a question of fact as to

whether Opti perceived Echols to be substantially limited in performing her job due to absences related to pregnancy, or due to absences for other reasons, or a combination of both.

Viewed in the light most favorable to Echols, the evidence establishes that Houston told her that her absences from work were making it more difficult to meet the production goals, that her pregnancy related doctor's appointments were taking time away from the office, and that she was being terminated because he felt her absences were going to prevent her from succeeding in the performance of her job. Echols Depo., pp. 110-11; Houston Depo., p, 67.

Because "'a person cannot be regarded as disabled unless the deficiency that the person is regarded as having is a disability,' an employee who is only able to show that her employer regarded her as impaired must also provide evidence that the imputed impairment is objectively substantially limiting." *Walton v. US Marshals Serv.*, – F3d –, 2007 WL 430426 (9th Cir Feb 9, 2007). EEOC regulations define working as a major life activity. 29 CFR § 1630.2(i). However, an inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working. *Deppe v. United Airlines*, 217 F3d 1262, 1265 (9th Cir 2000). A person is regarded as disabled not only if perceived as being impaired in the ability to perform his or her job, but also substantially impaired in performing "either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities" in the relevant labor market and geographic area. *Murphy v. United Parcel Service, Inc.*, 527 US 516, 523 (1999), citing 29 CFR §§ 1630.2(j)(3)(i) & (ii)(B). A plaintiff alleging a substantial limitation in the major life activity of working "must present specific evidence about relevant labor markets to defeat summary judgment" and "identify what requirements posed by the class of . . . jobs . . . were problematic in light of the

limitations imposed on her.  *Thornton v. McClatchy Newspapers, Inc.,*  261 F3d 789 795-96 (9th

Cir 2001) (citation omitted).

Echols has failed to meet this evidentiary burden by not presenting any specific evidence

of the relevant lost labor markets to prove that absenteeism substantially impairs her from

performing a class of jobs or a broad range of jobs in various classes as compared with the

average person having comparable training, skills, and abilities.  Instead, without citing any

authority, Echols urges this court to use common sense to conclude that an inability to have

regular attendance is substantially limiting because it is an essential function of *most* jobs.

However, it is possible that a variety of jobs in this geographic area would allow a person with

training, skills, and abilities comparable to Echols the flexibility to make up some missed time

due to doctor's appointments by working different hours or at home.  Without the benefit of

specific evidence, this court is left to merely speculate.

Because Echols has failed her *prima facie* burden and the court need not reach the

remaining steps of the *McDonnell Douglas* framework.  Therefore, Opti's motion for summary

judgment on this claim is granted.

## IV.    ERISA Claim (Fourth Claim)

### A.    Legal Standard

Section 510 of ERISA, 29 USC § 1140, provides in relevant part that "[i]t shall be

unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to

which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of

interfering with the attainment of any right to which such participant may become entitled under

the Plan . . ."   The purpose of this statute is to "prevent persons and entities from taking actions

which might cut off or interfere with a participant's ability to collect present or future benefits or

22 - OPINION

which punish a participant for exercising his or her rights under an employee benefit plan."
*Lessard v. Applied Risk Mgmt.*, 307 F3d 1020, 1024 (9th Cir 2002) (citations omitted).

An "employee welfare benefit plan" governed by ERISA is "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits . . . ." 29 USC § 1002(1) (emphasis added).

Under ERISA, "participant" means "any employee . . . of an employer . . . who is or *may become eligible* to receive a benefit of any type from an employee benefit plan . . . ."  29 USC § 1002(7) (emphasis added); *see also Peterson v. Am. Life & Health Ins. Co.*, 48 F3d 404, 408 (9th Cir 1995).  Section 510 of ERISA protects employees "who have an opportunity to attain rights in a covered benefit health plan."  *Dister v. Cont'l Group, Inc.*, 859 F2d 1108, 1115 (2nd Cir 1988).  Therefore, an employee does not have to be presently eligible to receive benefits under an employee benefit plan to be considered an ERISA plan "participant."  *Simpson v. Ernst & Young*, 879 F Supp 802, 816 (SD Ohio, 1994), *aff'd*, 100 F3d 436 (6th Cir 1996), *cert denied*, 520 US 1248 (1997).

Absent direct evidence of discrimination, the Ninth Circuit applies the *McDonnell Douglas* burden-shifting analysis to claims brought under 29 USC § 1140.  *Ritter v. Hughes Aircraft Co.*, 58 F3d 454, 457 (9th Cir 1995), citing *Dister*, 859 F2d at 1111-12.  To establish a *prima facie* case of discrimination under Section 510, a plaintiff must prove that:  (1) she is entitled to ERISA's protection; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of discrimination.  *Dister*, 859 F2d at 1114-15

(citations omitted).  No claim exists when the alleged loss of rights is a mere consequence of the termination, as opposed to a motivating factor behind it.  *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F2d 889, 896 (9th Cir 1990) (citations omitted).

    **B.**    <u>Analysis</u>

        1.    *<u>Prima Facie</u>* <u>Case</u>

Opti concedes that Echols is entitled to protection under Section 510 of ERISA. However, it asserts that she has not shown that she is qualified for her position or was discharged under circumstances giving rise to an inference of discrimination.  As discussed above, Echols has presented sufficient evidence that she was qualified for her position.  Therefore, the remaining issue remaining is whether Echols has made a *prima facie* showing that she was discharged under circumstances giving rise to an inference of discrimination.

According to Echols' evidence, on December 8, 2005, she asked Buxton about what to do and whom to contact to enroll in Opti's group health plan.  Buxton referred her to Houston. When Echols talked to Houston the next day about enrolling in the medical benefits plan, he told her that he would get the information to her the following day.

Echols urges this court to draw an inference of discrimination sufficient to meet her *prima facie* burden based solely on the temporal proximity of one or two days between the time she inquired about health benefits and her involuntary termination.  In support of her allegations, Echols relies on two retaliation cases and one ERISA discriminatory discharge case.  In *Thomas v. City of Beaverton*, 379 F3d 802, 812 (9th Cir 2004), a Title VII retaliation case, the causal link between a protected activity and a retaliatory action was inferred from timing alone when there was a close proximity between the two.  *Dister*, 859 F2d at 1108, concluded that the  plaintiff made out a *prima facie* ERISA discrimination case by offering evidence that he was discharged

four months before his enhanced pension benefit plans were to vest *and* evidence of substantial cost savings to the employer of approximately $550,000.  In *Rath v. Selection Research, Inc.*, 978 F2d 1087, 1090 (8th Cir 1991), the plaintiff alleged that his employer violated ERISA by terminating him in retaliation for questioning proposed changes to an employee stock ownership plan.  The court expressed its doubt that being discharged six months after the employer's reprimand could establish a *prima facie* case based on timing alone.  Nevertheless, it discussed the evidence at pretext stage and found for the employer.

Even if timing alone is sufficient for a plaintiff to meet her *prima facie* burden in an ERISA discrimination case, Echols' claim fails at the pretext stage, as explained below.

### 2.    <u>Legitimate Employer Reason</u>

Opti denies that it terminated Echols because she requested information about enrollment in the employee health plan.  As discussed above, Opti has offered evidence that it terminated Echols because of her poor work performance.  Opti also had no motive in firing Echols to avoid her from enrolling in the benefit plan.  While Opti pays a per capita premium for its group health insurance, the cost of the medical insurance coverage does not relate to the number of claims made by covered employees.

### 3.    <u>Pretext</u>

The Ninth Circuit has cautioned that "the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment."  *Coszalter v. City of Salem*, 320 F3d 968, 978 (9th Cir 2003).  Therefore, more than temporal proximity is needed to create an inference of ERISA discrimination at the pretext stage.  However, Echols has failed to offer any other evidence in support of its ERISA discrimination claim and to defeat Opti's

proffered reason for terminating her.  Without more evidence, Echols' ERISA discrimination claim fails.

**V.**    **<u>Conclusion</u>**

For the foregoing reasons, Opti's Motion for Summary Judgment (docket #17) is GRANTED as to Claim Three alleging Perceived Disability Discrimination and Claim Four alleging ERISA discrimination, and is otherwise DENIED.

DATED this 7th of March, 2007.


/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge